Law Offices of Dana Wefer, LLC
Dana Wefer, Esq.  Bar No:
036062007
375 Sylvan Avenue, Suite 32
Englewood Cliffs, NJ 07030
973-610-0491

| | |
|---|---|
| KATIE SCZESNY, JAMIE RUMFIELD, DEBRA HAGEN, and MARIETTE VITTI,<br><br>Plaintiffs,<br><br>vs.<br><br>THE STATE OF NEW JERSEY, GOVERNOR PHILIP MURPHY (in his official and personal capacity)<br><br>Defendants. | IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY<br><br>CIVIL ACTION<br><br>**VERIFIED COMPLAINT FOR DELCARATORY AND INJUNCTIVE RELIEF** |

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Katie Sczesny ("Ms. Sczesny"), Jamie Rumfield ("Ms. Rumfield"), Debra Hagen ("Ms. Hagen"), and Mariette Vitti ("Ms. Vitti") (collectively "Plaintiffs") by and through their counsel, complain against Defendants, The State of New Jersey, Governor Philip Murphy in his official and personal capacity, as follows:

**INTRODUCTION**

1. This is a civil action for declaratory and injunctive relief arising under the Fourteenth and Fourth Amendments to the United States Constitution.

2. It concerns the constitutionality of Executive Order 283 ("EO 283"), which requires Plaintiffs to receive a

"booster" shot as a condition of working in healthcare in New Jersey.

3. EO 283 violates the liberty and privacy rights protected by the Fourteenth Amendment to the U.S. Constitution, including the right to refuse medical procedures and the right to not be medically surveilled by government actors. It also violates the Equal Protection clause of the 14th Amendment, and the Fourth Amendment prohibition of unreasonable search and seizure, and the procedural due process clause.

**JURISDICTION AND VENUE**

4. This action arises under the Fourteenth Amendment and Fourth Amendment to the U.S. Constitution.

5. This Court has jurisdiction over all claims pursuant to the Declaratory Judgment Act as codified at 28 *U.S.C.* Sections 2201 and 2202.

6. Venue is proper under 28 *U.S.C.* Section 1391(b) because Defendant is located in this District and because a substantial part of the events giving rise the claim occurred in this District.

**PARTIES**

7. Plaintiffs are all current employees of Hunterdon Medical Center subject to Executive Order 283.

8. Defendant Philip Murphy ("Governor Murphy") is the governor of the State of New Jersey and is responsible for Executive Order 283.

## FACTUAL BACKGROUND

## I. THE PLAINTIFFS

9. Plaintiff Debra Hagen has been a nurse for 30 years and employed by Hunterdon Medical Center for 16 years. Exhibit A.

10. Ms. Hagen has a long and complicated medical history that includes seizures and serious adverse reactions to vaccines and medications.

11. At the age of 14 she was diagnosed with a seizure disorder due to hormones related to puberty. She developed reactions to the initial medications used to treat her seizures. At the age of 23 she weaned off the seizure medications because her neurologist believed her hormones were stable enough for her to do so. Declaration of Debra Hagen at ¶5.

12. For the next 15 years Ms. Hagen continued to suffer neurological symptoms, including migraines and vertigo, but no additional seizures, to her knowledge. Id. at ¶6.

13. However, in 2009 when pregnant with her fourth child, she developed shingles four times prior to giving birth and suffered a seizure when her son was 5 months old. An

EEG showed that she had persistent seizure activity in her brain and she was referred to an epileptologist. Id. at ¶7.

14. Unfortunately, Ms. Hagen suffered reactions to available seizure medications and was not able to tolerate many of them. She was instructed to manage her seizure condition to the best of her ability with strict lifestyle guidelines. She states: "I have been very careful with any medications, treatments, beverages, and anything else that I put into my body because I know that triggering another seizure would mean loss of my driver's license and likely my job." She avoids alcohol, certain medications, and strictly monitors and limits caffeine intake. She must be careful to get regular and sufficient sleep, to eat frequent meals, and avoid stressful situations to avoid seizure breakthroughs. Id. at ¶8.

15. Her body is susceptible to neurological and immune issues and she continues to develop Shingles 2-3 times per year when she has times of increased stress. Id. at ¶9.

16. In January 2016, Ms. Hagen fell down a flight of stairs and suffered a concussion. Her recovery was prolonged and she suffered post-concussion symptoms of brain fog, headaches, fatigue, and lack of concentration. Her doctor treated these symptoms with Adderall, which allowed her to

go back to work, but puts her at an increased risk for another seizure, especially as she suffers from tachycardia (increased heart rate) as a side effect of the medication. Id. at ¶11.

17. In 2019, Ms. Hagen underwent titer testing for measles, mumps, rubella, and varicella (chicken pox). Despite having had 3 MMR vaccines in the past, she did not show immunity to measles.  Neither did she show immunity to chicken pox, despite the fact that she had chicken pox and suffers from regular shingles because she has had chicken pox. Id. at ¶13.

18. Ms. Hagen received a fourth MMR vaccine and still did not develop immunity to measles. Id.

19. Ms. Hagen received another chicken pox vaccine and developed two back-to-back cases of shingles within 2 weeks of having received the vaccine and another case of shingles six months later.  Shingles is a known adverse event following the chicken pox vaccine Id.

20. Ms. Hagen's seizures have always been linked to her hormones and she is currently perimenopausal, which puts her at an even more increased risk of seizures. Id. at ¶14.

21. Ms. Hagen's complex neurological and immunological medical history makes her high-risk for neurological reactions and complications from medications, vaccines,

and even beverages.   She was nervous about taking any of the Covid-19 injections authorized for emergency use in the United States because she became aware of reports and data that people were suffering neurological side effects such as headaches, brain fog, fatigue, and Guillen-Barre syndrome. These are symptoms that Ms. Hagen could not risk because she is already being treated to control these symptoms. Id. at 15.

22.   Shingles is also a suspected adverse event for some people following the Covid-19 shots.

23.   Ms. Hagen tried everything she could to avoid getting any of the Covid-19 injections authorized for use in the United States, hoping that she would be able to get the Novovax vaccine instead because it has a safer side effect profile and does not use fetal cells, which goes against Ms. Hagen's religious beliefs. Id. at ¶¶15-16.

24.   Ms. Hagen's requests for a religious accommodation and medical accomodations were both denied. Given Governor Murphy mandate and the CMS (federal) mandate, she felt boxed into a corner, especially because both she and her husband work in the medical field and cannot afford to be out of work with 6 children to support. Id. at ¶¶15-16.

25.   Ms. Hagen took a chance on the J&J injection, which she received on January 26, 2022. Id. at ¶17.

26.   48 hours after receiving the J&J injection, she began to experience neurological symptoms.  The symptoms began with numbness, tingling, and sciatic pain through her entire left leg, which spread to her left arm within an hour. Her pain continued over the next several days and she developed additional symptoms, including: pain, numbness, and tingling in her right leg; headaches; dizziness; severe fatigue, and an inability to concentrate. Id.

27.  She sought medical help and was told by her doctor that she was having a reaction to the J&J shot and was presenting with symptoms of "demyelinating neuritis" that may progress into Guillen-Barre. Id.

28.  Ms. Hagen received an EMG on February 4, 2022, which showed that certain sensory nerves could not feel the electric stimulation.  She was diagnosed with "sensory neuropathy" and her doctor told her that she should not receive any further covid vaccinations and signed a medical exemption form for her stating the same. Id. at ¶18.

29.  Ms. Hagen's request for a medical accommodation was denied twice. Id. at ¶¶ 19-20.

30.  Ms. Hagen does not want to take any more of the Covid-19 injections because she does not want to risk exacerbating her health problems further. She feels that she needs to be able to make her own decisions about what

to put into her body, considering her doctor's advice, her personal medical history, and her life circumstances. <u>Id.</u> at ¶24.

31. Plaintiff Jaime Rumfield is a labor and delivery nurse at Hunterdon Medical Center.  Exhibit B, Declaration of Jaime Rumfield at ¶4.

32. She received the Moderna Covid-19 injections on March 8, 2021 and April 8, 2021. <u>Id.</u> at ¶5.

33. After receiving the injections she experienced severe headache, body aches, chills, fever, and a red rash surrounding the injection site. <u>Id.</u> at ¶5.

34. She tested positive for Covid-19 on December 31, 2021. She experienced headache, head congestion, runny nose, body aches, sore throat, and extreme exhaustion.  <u>Id.</u> at ¶6.

35. Six days after testing positive, while still symptomatic and likely still contagious, she was told she could return to work because her symptoms were resolving. <u>Id.</u> at ¶7.

36. Ms. Rumfield requested a 90 day extension on her deadline to take the booster after testing positive, but was told by HMC that she was eligible to receive the booster 5 days after testing positive for Covid-19. <u>Id.</u> at ¶¶ 8-9.

37. Ms. Rumfield submitted a request for a religious exemption, but it was denied on the basis that accommodating her would pose an undue burden on the

hospital. Id. at ¶10.

38.  Ms. Rumfield will not take any more Covid-19 injections because she has natural immunity, does not need her immunity to Covid-19 boosted due to her recent acute infection, and because it would violate her sincerely held religious beliefs. Id. at ¶11.

39.  Ms. Rumfield wants to make her own decisions with regard to her body, especially what is injected into her body. She feels that there is risk to the Covid-19 injections. Id. at ¶12.

40.  Plaintiff Katie Sczesny is a nurse employed by HMC.  She is pregnant. Declaration of Katie Sczesny at ¶ 4, Exhibit C.

41.  Ms. Sczesny received two shots of the Pfizer Covid-19 injection in September, 2021. She had severe spinal pain, joint aches, and a fever for 48 hours following the second shot. Id. at ¶7.

42.  Three months later, in December 2021, she became infected with Covid-19. Id. at ¶8.

43.  Ms. Sczesny was told by HMC that her recent Covid-19 infection and being fully vaccinated was not a legitimate reason to wait to get the booster. Id. at ¶10.

44.  Ms. Sczesny was told that her pregnancy was not a legitimate reason to wait to receive her booster. Id. at

¶11.

45. Ms. Sczesny underwent IVF to become pregnant with the baby she is currently carrying. Id. at ¶ 13.

46. Ms. Sczesny does not want to get the booster while pregnant. She does not want to take any risks with her baby and feels should have the right to make that decision for herself and her baby. Id. at ¶14.

47. HMC has denied Ms. Sczesny's request to wait to get her booster, despite a note from her doctor. Id. at ¶15.

48. Ms. Sczesny has been told by multiple people at HMC that Executive Order 283 is the reason she must receive the booster or lose her job. Id. at ¶16.

49. Plaintiff Mariette Vitti, RN, BSN-BC is board certified in Medical Surgical Nursing. She received two doses of the Moderna Covid-19 injection in May and June of 2021. Declaration of Mariette Vitti at ¶5, Exhibit D.

50. After receiving the second shot, she began having pain at the injection site, which progressed as the day went on to tingling in her fingers and then body aches for four days. Id. at ¶6.

51. The body aches were so severe that her clothing hurt to touch her. She had to tell her husband to keep her children away from her because anything touching her caused terrible pain. Id.at ¶6.

52.  However, her scariest and most severe side effect was rapid heart palpitations and her heart skipping beats, which appeared about 8 hours after her second shot. Ms. Vitti describes the experience thusly:

> I was putting clothes from the washer into the dryer and walked up the stairs and I felt my heart pounding like it was about to come out of my chest. I told my husband I was scared, and he may have to take me to the ER. I checked my apple watch and the heart rate was 168 after doing very minimal activity. I felt the need to lay down so I layed down on the couch and tried to bare down to decrease my heart rate down to 128 but no lower. From that day forward things that require minimal activity, walking up the stairs at home, leisurely walking to my car after work, can lead to heart rates up into the 130's and 140's and significant palpitations.

53.  Ms. Vitti visited a cardiologist and her ECG was found to be normal. She wore a heart monitor for two weeks. The report from her time wearing the monitor shows that she had a heart rate of up to 160 with trigemi\ny (an irregular heart beat). Id. at ¶¶8-9.

54.  Ms. Vitti does not want to take any more of the Covid-19 shots. She feels she was injured by the first one and does not want to further risk her health. She wishes to make her own decisions about what pharmaceuticals to put into her body.

**II. Executive Order 283**

55.  In January 2022, Governor Murphy signed Executive Order 283, which requires all covered workers in covered settings to be "up to date" on Covid-19 "vaccination" as a condition of continued employment. Exhibit E, Executive Order 283.

56.  "Covered workers" is defined as: "employees, both full- and part-time, contractors, and other individuals working in covered settings, including individuals providing operational or custodial services or administrative support."

57.  "Covered settings" is defined as:

> Health care settings" shall include acute, pediatric, inpatient rehabilitation, and psychiatric hospitals, including specialty hospitals, and ambulatory surgical centers; long-term care facilities; intermediate care facilities; residential detox, shortterm, and long-term residential substance abuse disorder treatment facilities; clinic-based settings like ambulatory care, urgent care clinics, dialysis centers, Federally Qualified Health Centers, family planning sites, and Opioid Treatment Programs; community-based 9 healthcare settings including Program of All-inclusive Care for the Elderly, pediatric and adult medical day care programs, and licensed home health agencies and registered health care service firms operating within the State. "High-risk congregate settings" include State and county correctional facilities; all congregate care settings operated by the Juvenile Justice Commission, which includes secure care facilities and residential

> community homes; licensed community
> residences for individuals with
> individuals with intellectual and
> developmental disabilities ("IDD") and
> traumatic brain injury ("TBI"); licensed
> community residences for adults with
> mental illness; certified day programs
> for individuals with IDD and TBI, and
> group homes and psychiatric community
> homes licensed by DCF.

58. "Up to date" is defined as having received "a primary series, which consists of either a 2-dose series of an mRNA COVID-19 vaccine or a single dose COVID-19 vaccine, and any booster doses for which they are eligible as recommended by the CDC."

59. On or around March 2, 2022, Governor Murphy signed Executive Order 290, which modified the time requirements set forth in Executive Order 283. Exhibit F, Executive 290.

60. This was necessary because the CDC changed its recommendations for time between first and second mRNA shots from six weeks to eight weeks.

61. Upon information, belief, and local reporting, the extended deadline was also necessary to prevent staffing shortages because a significant percentage of healthcare workers had chosen not to get a third Covid-19 shot.

62. On April 13, 2022, Governor Murphy signed executive order 294 changing the definition of "up to date" in

Executive Order 283.  This was necessary because on March 29th the FDA issued an updated emergency use authorization for a second "booster" dose and on March 30, 2022 the CDC advised that all people 50 years or older and all people 18-29 who received two Janssen shots are eligible for a second "booster."  Exhibit G.

63.  Executive Order 294 states "Whereas, as of March 30, 2022, the CDC advised that, while some individuals are eligible for a second mRNA booster dose, the CDC currently considered a person boosted and up to date with their Covid-19 vaccination after receiving their first booster dose at this time."

64.  Executive Order 283 requires any covered workers who are not "up to date" on their Covid-19 shots to test weekly or twice weekly until they "submit adequate proof that they are up to date with their vaccination."

65.  EO 283 requires all covered settings to include a disciplinary process for "noncompliance," which New Jersey says may include termination of employment.

66.  Executive Order 283 requires covered settings to allow for medical and religious exemptions to vaccination, however the State of New Jersey itself has mass-denied religious exemptions in state institutions, stating that accommodating people with religious exemptions would

constitute an "undue burden" on the state because the employees with religious objections to the Covid-19 injections are a "threat" to the safety of others.

67. The Superintendent of Police is given full "discretion to make additions, amendments, clarifications, exceptions, and exclusions to the terms" of Executive Orders 283, 290 and 294.

## CONSTITUTIONAL CLAIMS

### I.

### EXECUTIVE ORDER 283 VIOLATES PLAINTIFFS' 14TH AMENDMENT RIGHTS TO LIBERTY AND PRIVACY

68. Plaintiffs repeat and reallege each of the preceding paragraphs.

69. People have a strong liberty and privacy interest and right in exercising sovereignty over their body and declining unwanted medical procedures like the Covid-19 injections.

70. Plaintiffs have strong liberty and privacy rights to decline medical procedures that have injured them or made them ill when they have taken them before.

71. The state's interest in stemming the spread of Covid-19 through requiring people to undergo an unwanted medical procedure must be weighed against the individual right to decline medical procedures that are novel, have hurt them

in the past, and that carry known and unknown risks.

72. The individual's right to decline further injections with the Covid-19 pharmaceuticals outweighs the state's interest when:

    a. It is common knowledge that the injections do not prevent infection and transmission and that people who have received the injections can still become infected with and transmit Covid-19;

    b. There are known and unknown risks of taking the pharmaceuticals;

    c. The person being mandated to take the pharmaceuticals has taken them in the recent past and been hurt by them;

    d. There are no long-term studies on the pharmaceuticals and long-term effects are unknown;

    e. The person being mandated to take the pharmaceuticals has taken in the past and the pharmaceuticals did not work to prevent them from getting sick;

    f. The targeted disease has a low mortality rate overall and a very low mortality rate for the individual;

    g. There are a wide range of treatments available for people who do become sick with the virus;

    h. the individual who the government wishes to compel to take the pharmaceutical has been advised by their

doctor not to take the pharmaceutical;

i. The medical procedure the government wishes to compel is novel and experimental with unknown long-term effects;

j. The medical procedure was invented by and is manufactured by corporations with criminal track records or no track record at all;

k. The FDA advisory committee voted 16-2 to NOT recommend the medical procedure citing safety concerns;

l. The CDC advisory panel on immunizations voted against recommending the procedure for adults under 50;

m. The federal agency tasked with oversight of public safety (FDA) is plagued by scandals and high profile failures and acted contrary to its own advisory committee's recommendations;

n. The medical procedure involves a new technology that has never before been approved for or used in healthy humans, never mind three doses in less than a year period;

o. It does not account for immunity gained through infection and recovery.

73.   The Mandate is unconstitutional.

## II.
## THE MANDATE VIOLATES THE EQUAL PROTECTION CLAUSE OF THE 14TH AMENDMENT

74. Plaintiffs repeat and reallege each of the preceding paragraphs as if set forth at length herein.

75. Plaintiffs are subject to a disciplinary process based on their assertion of their fundamental rights to liberty and privacy.

76. Plaintiffs are subject to search and seizure of their bodily fluids based on their assertion of fundamental rights to liberty and privacy.

77. The unequal treatment is not narrowly tailored to serve a compelling government interest.

78. The unequal treatment is based on the exercise of a fundamental right and violates the constitution.

### III.

### EXECUTIVE ORDER 283 VIOLATES PLAINTIFFS' RIGHT TO DUE PROCESS UNDER THE 14TH AMENDMENT TO THE U.S. CONSTITUTION

79. Plaintiffs all attended college to obtain their nursing degrees.

80. Plaintiffs all passed board examinations to obtain their nursing licenses.

81. Plaintiffs Debra Hagen and Mariette Vitti have obtained higher degrees, certifications, and licenses to practice their profession.

82. Plaintiffs all have property interests in their degrees,

certifications, and licenses.

83.   Executive Order 283 essentially regulates Plaintiffs out of practicing in the healthcare field in New Jersey unless they surrender their bodies for injection with another Covid-19 shot.

84.   Plaintiffs have all been *de facto* barred from using their licenses and degrees in New Jersey without due process of law.

85.   Executive Order 283 deprives Plaintiffs of liberty and property rights without due process of law.

86.   Executive Order 283 violates the due process clause of the 14th Amendment to the United States Constitution.

**IV.**

**EXECUTIVE ORDER 283 IS AN UNCONSTITUTIONAL TAKING WITHOUT COMPENSATION UNDER THE FIFTH AMENDMENT, APPLIED TO NEW JERSEY THROUGH THE 14TH AMENDMENT**

87.   Plaintiffs all have property interests in their degrees, certifications, and licenses.

88.   Executive Order 283 essentially regulates Plaintiffs out of practicing in the healthcare field in New Jersey unless they surrender their bodies for injection with another Covid-19 shot.

89.   Plaintiffs have all been *de facto* barred from using their licenses and degrees in New Jersey without due process of law.

90.  Executive Order 283 takes away Plaintiffs' ability to practice in their chosen professions and purports to do so for the public good.

91.  Executive Order 283 violates the takings clause of the 5th Amendment because it regulates Plaintiffs out of the healthcare field, purportedly for the public good, and without compensation for the loss of property rights inherent in their degrees and licenses.

## V.

## THE MANDATORY MEDICAL TESTING VIOLATES PLAINTIFFS' RIGHT TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE

92.  The medical testing that is required of Plaintiffs if they remain employed and do not receive a booster is an unreasonable search and seizure.

93.  It requires Plaintiffs to surrender their bodily fluids for analysis without any particularized suspicion, without a warrant, and without due process.

94.  The medical testing requires Plaintiffs to surrender and report personal information about their health status without any particularized suspicion, without a warrant, and without due process.

95.  The medical testing violates the 4th Amendment.

## VI.

## VIOLATION OF 42 U.S.C. §1983

96.   Plaintiffs repeat and reallege each of the preceding paragraphs as if set forth fully herein.

97.   Governor Philip Murphy has, while acting under the color and authority of law, deprived Plaintiffs of their constitutional rights.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs request the following relief:

98.   Declare Executive Orders 283, 290 and 294 unconstitutional;

99.   Declare Executive Order 283, 290, and 294 unconstitutional as applied to each Plaintiff;

100.  Enjoin HMC and the State of New Jersey from enforcing the Mandate;

101.  Grant Plaintiffs their costs and attorneys' fees under 42 U.S.C. Section 1988 and any other applicable authority; and

102.  Grant any and all other such relief as this Court deems just and equitable.


Respectfully submitted,


Dated:   April 18, 2022
                                    s/ Dana Wefer, Esq.

                                    Dana Wefer, Esq.
                                    Attorney at Law

375 Sylvan Ave, Suite 32
Englewood Cliffs, NJ 07075
Phone:  (973) 610-0491
Fax:  (877) 771-2211
Email: DWefer@WeferLawOffices.com
Attorney for Plaintiffs

## COMPLAINT VERIFICATION

Each of the Plaintiffs has sworn in the attached and incorporated Declarations that all facts pertaining or relating to them are true under penalty of perjury.

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

The matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated: April 20, 2022          /s Dana Wefer, Esq.
                               Dana Wefer, Esq.
                               Attorney at Law
                               375 Sylvan Ave, Suite 32
                               Englewood Cliffs, NJ 07075
                               Phone:  (973) 610-0491
                               Fax:  (877) 771-2211
                               Email: DWefer@WeferLawOffices.com
                               Attorney for Plaintiffs

# EXHIBIT A

## <u>DECLARATION OF DEBRA HAGEN</u>

I, Debra Hagen, being of full age and sound mind do hereby swear and affirm:

1. I have personal knowledge of myself, my activities, and my intentions.

2. If called on to testify I would competently testify as to the matters stated herein and concerning me and my activities in the Verified Complaint.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements contained herein are true and correct.

4. I have been a Nurse since 1992 and started working at Hunterdon Medical Center ("HMC") in October of 2006 as an Emergency Department RN.  I worked in the emergency department for 10 years.

5. I have a long history of Neurologic problems. I was diagnosed with a seizure disorder at age 14, during puberty, which they had difficulty controlling with medications and I suffered severe side effects from some of the medications they tried. At age 23, I was weaned off the medications, as the neurologist believed my hormones were stable enough for my seizures to subside.

1

6. Through the next 15 years I had issues with migraines related to my hormones and occasional vertigo, but no additional seizures that I was aware of.

7. At age 38 in 2009, while pregnant with my fourth child, I developed shingles 4 times prior to giving birth, and then had a seizure when he was 5 months old. I was working at HMC at the time and was seen by Dr. Viradia, a neurologist. He sent me for an EEG which was abnormal and then a 72-hour EEG, which showed persistent seizure activity in my brain that was not manifesting physically. He referred me to an epileptologist in Princeton who tried a couple other seizure medications, which I had reactions to and was not able to tolerate.

8. I was given strict guidelines to avoid certain over the counter medications, alcoholic beverages, more than 1 cup of caffeine per day and stressful situations. I need regular sleep and frequent meals to avoid these seizure breakthroughs. Since then, I have been very careful with any medications, treatments, beverages, and anything else that I put into my body because I know that triggering another seizure would mean loss of my driver's license and likely my job.

9. I continued to develop Shingles every time that I had increased stress approximately 2-3 episodes per year for

the next 10 years, which I always get in the same area of my lower back and causes sciatic pain down my right leg.

10.   In 2014, I started a "Behavioral Health hold committee" that resulted in The Joint Commission awarding HMC with Excellence of Behavioral Health in the Emergency Department. During this time, I also had gotten divorced and was the sole income for 5 children.

11.   My time as an ED nurse at HMC ended when I fell down the stairs at home in January of 2016 and suffered a concussion. I was out of work for 8 months with that injury.   I returned to Dr. Viradia who treated my concussion. My prolonged recovery, caused him to suspect underlying ADHD and he treated my post-concussion symptoms of headaches, brain fog, fatigue and lack of concentration with Adderall. This treatment worked and I was able to work again, however it is also a stimulant, and it makes me nervous that I may have another seizure. I am currently taking the maximum dose and have side effects of tachycardia and severe dry mouth, so I have been trying to wean down to a lower dose.

12.   After returning to the workforce in September, I was employed at Compassionate care hospice until I returned to HMC in March 2020 to work at Hunterdon Hospice where I am presently still employed.

13.     I had returned to school 3 years ago and as part of the physical exam required for clinical, I had blood work to check my immunity status of Measles, Mumps, Rubella, and varicella (chicken pox). To my surprise, my lab results said that I was not immune to Measles or varicella, which I had shown immunity on prior bloodwork. I already had 3 MMRs in my history, and I obviously had chicken pox as that is what causes shingles. I received another MMR, my fourth, which after another round of bloodwork still did not show immunity.

14.     When I received the varicella vaccine (which did show immunity post-vaccination) within 2 weeks of the vaccine, I suffered from 2 back-to-back cases of shingles (which is listed on the WHO information sheet as a "Severe Adverse Event"). I thought maybe my immunity status was why I had suffered with them so frequently and now that I am immune on blood tests, I would no longer suffer from these shingles' episodes, however 6 months later I broke out again.

15.     I just graduated in December with my MSN as a Family Nurse Practitioner. I am also currently perimenopausal and with fluctuating hormone levels at increased seizure risk.

16.     Taking all that history into consideration, neurologically I am high risk. I was very nervous when the

4

vaccine came out and I saw reports and data of people were having side effects of headaches, brain fog, fatigue and Guillen Barre syndrome, symptoms that I could not afford since I am already being treated to control most of those symptoms. I tried everything to try to avoid getting the vaccine. My religious exemption was denied, they would not even consider my medical exemption because I did not have an anaphylactic reaction to a covid vaccine. I knew that if I were to have a reaction it would most likely neurologically related, and my gut was telling me that not enough research has been done on the long-term effects of the mRNA vaccines and these were the vaccines with the brain fog and fatigue side effects.

17.    I also noticed that every time the vaccines were pushed on elderly, we would have a large increase in admissions onto hospice. Most of these patients had cancer that was in remission, but after receiving the vaccine (or booster) the cancer would spread. I had read that the MRNA vaccines cause the killer T cells to decrease for at least 4 weeks. Killer T cells are the part of the immune system that keep cancer cells in check and defend the body from these invaders. Some of the patients signed on with a sudden decline in status after the MRNA vaccine and died prior to their second shot.

18.    With the Governors mandate as well as the CMS mandate I felt boxed into a corner. My husband and I are both in the medical field and cannot afford to be out of work with 6 children between us. We had been waiting for the Novavax vaccine to be approved as it is being used in other countries and has a much safer side effect profile and does not use fetal cells. After much research, I decided to take a chance with the J&J vaccine, to try to save my job, as it seemed the better choice neurologically and it was only 1 shot (hoping for Novavax prior to the booster).

19.    I received the J&J vaccine on January 26th at the HMC clinic in Lebanon and I was very happy that I initially felt fine for the first two days after the vaccine. Exactly 48 hours after the vaccine on Friday January 28th, without doing anything strenuous, I suddenly felt like I pulled a muscle in my left leg, then within 20 minutes I had numbness, tingling and sciatic pain through my entire left leg. Approximately 1 hour later I had numbness in my left arm as well. I contacted Dr. Viradia Friday night, and he said he would see me Monday at the office. On Saturday, Sunday, and Monday I had pain, numbness and tingling in both of my legs, headaches, dizziness, inability to concentrate, and severe fatigue. Dr. Viradia said that I was having a reaction to the vaccine and was presenting

with symptoms of a "demyelinating neuritis" that may progress into Guillen Barre and instructed me to go directly to the emergency room if I have any shortness of breath.

20.    I tried to get as much rest as possible, took vitamins and supplements to help my body respond to this attack on its system. I returned to his office on February 4th for an EMG seemed to be showing improvement. The EMG showing my muscle response to stimulation was normal, however certain sensory nerves could not feel the electric stimulation. He diagnosed me with "Sensory neuropathy" and stated again that I should not receive any further covid vaccinations and signed a  medical exemption form sent to me from Occupational health which is a very basic form asking for my information, provides information of what is considered a contraindication or precaution, then has a very small space for the physician to write what contraindication or precaution the patient has, the date that this extends until, and the Physicians information and signature.

21.    I submitted the form and my portion to occupational health on February 5th and they denied my medical exemption on February 6th stating that my exact reaction was not described and that a reaction to the J&J vaccine does not excuse me from receiving one of the MRNA boosters.

7

22.    In the meantime, I was still struggling with pain and numbness, headaches, dizziness, and brain fog that varies depending on if I get at least 8-12 hours of sleep. That is very difficult to do with children who need to get up at 6am for school and working evenings from 430pm – 1 am. A workers compensation case was opened as I have been unable to work my 8 hours during the day

23.    I re-submitted a second form and a letter from Dr. Viradia stating that I am still under his care for the reaction to the covid vaccines on March 25th. The second request was also quickly denied citing the same reasons.

24.    On March 31, 2022, I sent a letter to Patrick Gavin, CEO, David Christiansen, MD (head of Occupational health), Barbara Tofani, MSN administrator of home health, Yeung Bae, Director of Hospice, and David Skillinge, DO, who had promised me a position as an NP in January if I stayed with Hunterdon Healthcare Systems (HHS). This email requested a temporary medical exemption citing some articles explaining the reaction I am having and that it has been found to be an auto-immune response to the spike protein in the vaccines, which causes "Long Covid" symptoms in certain people, mostly women under the age of 55. I have received a response from Yeung Bae discussing possible future

employment as an NP if by some miracle this medical exemption is granted, or the mandate is discontinued.

25.    On April 12, 2022, I received a response from both Dr. Christiansen and Antoinette Rice (on behalf of Patrick Gavin) stating that they reviewed my case, that Dr. Christiansen contacted the CDC and that they cannot grant my exemption. I am still waiting to hear about continued workers compensation.

26.    The original plan with Dr. Viradia at my routine visit was to try to decrease my dose of Adderall once I complete my boards. I originally was scheduled to take my boards on February 18th. Due to the reaction of fatigue and brain fog (confusion), I needed to delay taking my exam for 2 months. I passed my boards on April 7, 2022, however it was followed by two days of severe fatigue, confusion, and dizziness.

27.    Since these symptoms are persisting, I will not be able to decrease the medication as planned. How long these symptoms will last is unknown now. I am still receiving worker's compensation benefits 8 hours per week and do not foresee how I would be able to function in an 830am-5pm position Monday through Friday

28.    I do not want to take any more of the covid-19 vaccines. I feel that I need to be able to make my own

decisions about what to put in my body, considering my doctor's advice, my personal medical history, and my life circumstances.

Dated: __04/15/2022_____

_____
Debra Hagen, MSN, FNP, RN

# EXHIBIT B

### <u>DECLARATION OF JAMIE RUMFIELD</u>

I, Jamie Rumfield, being of full age and sound mind do hereby swear and affirm:

1. I have personal knowledge of myself, my activities, and my intentions.

2. If called on to testify I would competently testify as to the matters stated herein and in the Verified Complaint.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements contained herein are true and correct.

4. I am an RN, and have been a labor and delivery nurse at Hunterdon Medical Center (HMC) since May 2019.

5. I received the Moderna COVID-19 Vaccine on 3/8/21 and 4/8/21. I had severe headache, body aches, chills, fever, and a red rash surrounding the injection site.

6. I tested positive for COVID-19 on 12/31/21. I had a headache, head congestion, runny nose, body aches, sore throat, and extreme exhaustion.

7. I was allowed to return to work on 1/6/22 as my symptoms were resolving. This was 6 days after testing positive, likely still contagious and potentially exposing my patients.

8. Occupational health (the department that is dedicated to the well-being and safety of employees in the work place) told me I was eligible for the booster 5 days from the date of my positive test.

9. Both Dr. David Christiansen, Director of Occupational & Corporate Health Services at HMC, and my primary doctor, Dr. Dierdre Andrews, denied my request for a 90-day extension from the date of my positive test. They both stated that the booster can be administered as soon as I recovered from COVID-19 and completed the required isolation period.

10.    I submitted a request for religious exemption and was denied on 2/16/22 by the committee who reviews all religious exemptions at HMC- stating that an accommodation for my religious beliefs cannot be granted without creating an undue hardship on the organization.

11.    I am being suspended/terminated 4/12/22 because I refuse to be administered the booster after having natural immunity following my recent acute infection, and due to my sincerely held religious beliefs.

12.    I do not want to take the booster because it is not necessary to boost my immune system after infection, and because I was born with the God-given right to bodily autonomy without controlling influences. I want to make my

own decisions with regard to my body, especially what is injected into my body. When there is risk, there must be consent.

13.    I feel that my liberty is being impinged upon by the government conditioning my employment upon undergoing further medical procedures/treatment I do not want.

Dated: __4/11/22__

Jamie J Rumfield, RN

Jamie Rumfield, RN

# EXHIBIT C

## DECLARATION OF KATIE SCZESNY

I, Katie Sczesny, being of full age and sound mind do hereby swear and affirm:

1. I have personal knowledge of myself, my activities, and my intentions.

2. If called on to testify I would competently testify as to the matters stated herein and concerning me and my activities in the Verified Complaint.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements contained herein are true and correct.

4. I am a 34 year old pregnant nurse employed by Hunterdon Medical Center in Flemington, NJ.

5. I have been a nurse for 6 1/2 years.

6. I have been with HMC for 3 1/2 years, and with an affiliated facility for 4 1/2 years.

7. I received both Pfizer vaccines in Sept. 2021, before we planned on getting pregnant again. I had severe spinal pain, joint aches, and a fever for 48 hours following my second vaccine.

8. I was diagnosed with Covid after showing symptoms on Dec. 29, 2021.

9. I was informed that I have until April 11, 2022 to get the booster, as per the NJ state mandate set in place by Governor Murphy.

10. I was told having Covid recently on top of being fully vaccinated were not legitimate reasons to wait to receive my booster.

11. I was told being pregnant is not a legitimate reason to wait to receive my booster.

12. I was diagnosed with infertility for no known medical reasons in 2019, after trying to get pregnant for 2 years. We had to go through IVF to get pregnant with our daughter in 2019.

13. After trying to get pregnant with baby #2 for 9 months, we had to undergo IVF again to get pregnant.

14. I do NOT want to get the booster while pregnant. We paid out of pocket for IVF and don't want to risk ANYTHING. I should have a right to make that decision for my unborn baby and myself.

15. I have been denied a request to extend the date of my booster until after I deliver, even with a note from my primary doctor requesting the extension.

16. I have emailed my request for extension to the medical director of our occupational health. After he denied me and I questioned his decision, he told me to email the Chief

Medical Director of the hospital. The chief medical director then forwarded my email to the chief of nursing of the hospital. The chief of nursing then informed me she will forward my email to the committee who makes those decisions, which seems to be the person my request first started with. I am being given the runaround and Governor Murphy's executive order is cited as the reason I must receive the booster or lose my job.

17. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 4-10-2022

Katie Sczesny, RN

# EXHIBIT D

### DECLARATION OF MARIETTE VITTI

I, Mariette Vitti, being of full age and sound mind do hereby swear and affirm:

1. I have personal knowledge of myself, my activities, and my intentions.

2. If called on to testify I would competently testify as to the matters stated herein and concerning me and my activities in the Verified Complaint.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements contained herein are true and correct.

4. My name is Mariette Vitti RN, BSN-BC (RN with my bachelors and board certified in Medical Surgical nursing).

5. I received the first two doses of Moderna COVID-19 vaccine in May and June of 2021.

6. After receiving the second Moderna vaccine dose I began having pain at the injection site which progressed as the day went to tingling in my fingers and then just body aches for 4 days following. The body aches were so bad my clothes hurt to touch me. I told my husband to keep my children away from me because anything touching me caused terrible pains. But the most serious and scary side effect that began just eight hours after the vaccine administration was the rapid heart rate with palpitations and skipping beats.

7. I got the vaccine around 0945 and around 1930 I was putting clothes from the washer into the dryer and walked up the stairs and I felt my heart pounding like it was about to come out of my chest. I told my husband I was scared, and he may have to take me to the ER. I checked my apple watch, and my heart rate was 168 after doing very minimal activity. I felt the need to lay down so I layed down on the couch and tried to bare down to decrease my heart rate and with doing this I was able to get my heart rate down to 128 but no lower. From that day forward things that require minimal activity, walking up the stairs at home, leisurely walking to my car after work, can lead to heart rates up into the 130's and 140's and significant palpitations.

8. I saw a cardiologist where my ECG was found to be normal and I wore a monitor for two weeks which per the cardiologist RN "you have a lot of PVCs with sinus tachycardia, so you're a nurse you know what to do just stop drinking coffee and drink more water."

9. When I obtained my records, it was noted on the report that I had a heart rate of up to 160 at its highest with trigeminy (an irregular heart beat).

10. I do not want to take any more of the covid-19 vaccines. I feel that I need to be able to make my own decisions about what to put in my body, taking into account my doctor's advice, my personal medical history, and my life circumstances. I am afraid that taking more of the Covid-19 shots will hurt me.

Dated: 4/10/2022

Mariette Vitti RN, BSN-BC