## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

| | |
|---|---|
| KATIE SCZESNY *et al.*,<br><br>            Plaintiffs,<br><br>     v.<br><br>THE STATE OF NEW JERSEY,<br>GOVERNOR PHILIP MURPHY (in his<br>official and personal capacity),<br><br>            Defendants. | Civ. No. 22-2314 (GC)<br><br>**OPINION** |

<u>CASTNER, District Judge</u>

**THIS MATTER** comes before the Court on the Verified Complaint and Brief in Support of Application for a Temporary Restraining Order and/or Preliminary Injunction (the "Application"), filed by Dana Wefer, attorney for Plaintiffs Katie Sczesny, Jamie Rumfield, Debra Hagen, and Mariette Vitti (collectively, "Plaintiffs"). (ECF Nos. 1, 2.) On May 9, 2022, Defendants State of New Jersey and Governor Philip Murphy (collectively, "Defendants") opposed the Application. (ECF No. 10.) On May 13, 2022, Plaintiffs filed a Reply. (ECF No. 13.) The Court has decided the Application based on the written submissions of the parties and without oral argument, pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons stated herein, Plaintiffs' Application is **DENIED**.

## I.   **BACKGROUND**

### A.   The Parties

This case involves a constitutional challenge to Executive Orders 283, 290, and 294 issued in January, March, and April 2022, respectively (the "Executive Orders"). Plaintiffs are "current employees of Hunterdon Medical Center" and are subject to the Executive Orders. (Verified Compl. ¶ 7, ECF No. 1.) Defendants are the State of New Jersey ("the State") and New Jersey Governor Philip Murphy, in his official and personal capacity ("Governor Murphy"). (*Id.* ¶ 8.) Hunterdon Medical Center ("Hunterdon") is not a party to this action.[1]

Plaintiffs assert that, taken together, the Executive Orders "require[] Plaintiffs to receive a 'booster' shot as a condition of working in healthcare in New Jersey," (*id.* ¶ 2), which violate the doctrine of unconstitutional conditions, and the due process and equal protection clauses of the Fourteenth Amendment, (TRO Appl. 2, ECF No. 2). Plaintiffs seek an order "enjoining [Executive Order] 283 and enjoining [Hunterdon] and Governor Murphy from enforcing it in any way." (*Id.* at 40; *see also* Proposed Order 1–2, ECF No. 2-2.)

### B.   The Executive Orders

On January 19, 2022, Governor Murphy issued Executive Order 283. *See* Executive Order 283 (2022) (hereinafter, "EO 283"). EO 283 requires "covered health care settings" to "maintain a policy that requires 'covered workers' to provide adequate proof that they are up to date with their COVD-19 vaccinations," including boosters for which they are eligible. *Id.* ¶¶ 1–2, 8. EO 283 provides schedules by which workers must be "up to date with their COVID-19 vaccinations." *Id.* ¶¶ 1–2.

---

[1] While Plaintiffs appear to have served Hunterdon, (Certificate of Service, ECF No. 4), and seek relief against Hunterdon, (Verified Compl. ¶ 100), Plaintiffs do not identify Hunterdon in the caption or as a party in the Verified Complaint, (*id.* ¶¶ 7–8).

Covered health care settings include "acute, pediatric, inpatient rehabilitation, and psychiatric hospitals, including specialty hospitals, and ambulatory surgical centers," and "Federally Qualified Health Centers." *Id.* ¶ 6. Covered workers include full- and part-time employees at covered settings. *Id.* ¶ 7. Covered workers are "up to date with COVID-19 vaccinations" when they have received "a primary series, which consists of either a 2-dose series of an mRNA COVID-19 or a single dose COVID-19 vaccine, and any booster doses for which they are eligible as recommended by the CDC." *Id.* ¶ 8.

On March 2, 2022, Executive Order 290 updated the schedules for covered workers to provide proof of "up to date vaccination," including a booster dose. *See* Executive Order 290 (2022) (hereinafter, "EO 290").

On April 13, 2022, Executive Order 294 clarified the definition of "up to date" with COVID-19 vaccinations to include only the first booster for which the covered worker is eligible, and not the second booster "because the CDC has not recommended that a second booster dose is necessary to be up to date with the COVID-19 vaccination at this time[.]" *See* Executive Order 294 (2022) (hereinafter, "EO 294").

Accordingly, taken together, EOs 283, 290 and 294 require covered settings to institute policies requiring covered workers to get vaccines, including the first booster for which they are eligible, in accordance with the schedules set forth in EO 290. There are two different schedules: one for covered settings subject to the "CMS Rule" and the other for covered settings not subject to the "CMS Rule." *See* EO 283 ¶¶ 1–2, EO 290 ¶¶ 1–2. The "CMS Rule" is a rule that Centers for Medicare & Medicaid Services ("CMS") issued on November 5, 2021, requiring most Medicare- and Medicaid-certified providers to establish COVID-19 vaccination requirements for staff because vaccination of healthcare workers was "necessary for the health and safety of

individuals to whom care and services are furnished." *Biden v. Missouri*, 142 S. Ct. 647, 653

(2022) (citing Interim Final Rule, 86 Fed. Reg. 61561, 61616–61627 (Nov. 5, 2021)).[2] On January

13, 2022, the United States Supreme Court upheld the CMS Rule by staying injunctions of it

imposed by lower courts. *Id.* at 653–55.

Covered settings subject to the CMS Rule must maintain a policy requiring covered

workers to provide adequate proof that they are up to date with COVID-19 vaccinations, including

the first booster for which they are eligible by April 11, 2022, or within three weeks of becoming

eligible for the booster, whichever is later. EO 283 ¶ 1; EO 290 ¶ 1. Covered settings not subject

to the CMS Rule must maintain a policy that requires covered workers to provide adequate proof

that they are up to date with their COVID-19 vaccinations, including the first booster for which

they are eligible by May 11, 2022, or within three weeks of becoming eligible for a booster dose,

whichever is later. EO 283 ¶ 2; EO 290 ¶ 2.[3]

Pursuant to the Executive Orders, covered settings "must include a disciplinary process for

covered workers' noncompliance, which may include termination of employment." EO 283 ¶ 4.

A covered setting must take "the first step toward bringing a noncompliant covered worker into

compliance as part of the disciplinary policy . . . within two weeks of the [above dates]." EO 290

¶ 3.

---

[2] In promulgating the CMS Rule, CMS made findings that these vaccine requirements were necessary for the safety of patients based on data showing how quickly COVID-19 can spread among healthcare workers to patients, particularly if the healthcare worker was unvaccinated. *Id.* at 651.

[3] Additionally, the Executive Orders provide schedules for unvaccinated covered workers to receive their primary series of a COVID-19 vaccination. (EO 283 ¶¶ 1.a., 2.a.; EO 290 ¶¶ 1.a., 2.a.) The Court does not consider these sections in its analysis because Plaintiffs have already received their primary series of a COVID-19 vaccination. (TRO Appl. 1.)

A covered setting may institute a "vaccination policy that includes additional or stricter requirements so long as such policy comports with the minimum requirements of this Order." EO 283 ¶ 9. And, a covered setting must provide "appropriate accommodations, to the extent required by federal and/or state law, for employees who request and receive an exemption from vaccination because of a disability, medical condition, or sincerely held religious belief, practice, or observance." *Id.* ¶ 10.

### C.      Plaintiffs' Alleged Injuries

Plaintiffs do not want to receive a booster dose because they "want to make their own decisions with regard to what is injected into their bodies, based on their individual circumstances and health." (TRO Appl. 10.) Each plaintiff submits a sworn declaration explaining personal reasons for not wanting the booster. (*See* Verified Compl., Hagen Decl. Ex. A; Rumfield Decl. Ex. B; Sczesny Decl. Ex. C; Vitti Decl. Ex. D.)

Hagen avers that she is "neurologically . . . high risk," and experienced "pain, numbness, and tingling [in her legs], headaches, dizziness, inability to concentrate and severe fatigue" after her single-dose vaccine. (Hagen Decl. ¶¶ 16, 19.) On February 5, 2022, Hagen submitted a medical exemption form to Hunterdon's "occupational health" department, which denied her request on February 6, because Hagen's "exact reaction was not described and that a reaction to the J&J vaccine does not excuse [her] from receiving one of the MRNA boosters." (*Id.* ¶ 21.) Hagen also sent a letter to the head of occupational health at Hunterdon, requesting a "temporary medical exemption" and citing "articles explaining the reaction [she was] having [to the vaccine] and that [the vaccine] has been found to be an auto-immune response to the spike protein in the vaccines, which causes 'Long Covid' symptoms in certain people." (*Id.* ¶ 24.) Hunterdon denied

that request on April 12, 2022, stating that "they reviewed [her] case, that [they] contacted the CDC[,] and that they cannot grant [her] exemption." (*Id.* ¶ 25.)

Rumfield avers that she experienced a "severe headache, body aches, chills, fever, and a red rash surrounding the injection site" after her two-dose mRNA vaccine. (Rumfield Decl. ¶ 5.) She caught COVID-19 after receiving the vaccination. (*Id.* ¶ 6.) Rumfield submitted a request for an extension to get the booster 90-days after her positive test, which both Hunterdon and her primary doctor denied, stating that "the booster can be administered as soon as [Rumfield] recovered from COVID-19 and completed the required isolation period." (*Id.* ¶ 9.) She also requested a "religious exemption," which Hunterdon denied on February 16, 2022, on the grounds that "an accommodation for [her] religious beliefs [could not] be granted without creating an undue hardship on the organization." (*Id.* ¶ 10.)

Sczesny is pregnant and does not want to get the booster while pregnant. (Sczesny Decl. ¶¶ 4, 14.) She requested an extension for the deadline to get a booster, to which she claims Hunterdon is giving her "the runaround." (*Id.* ¶ 16.) She states that Hunterdon "cite[s]" "Governor Murphy's executive order . . . as the reason [she] must receive the booster or lose [her] job." (*Id.*)

Vitti avers that, after receiving the second dose of her vaccine, she experienced heart palpitations. (Vitti Decl. ¶¶ 6, 7.) She fears that "taking more of the COVID-19 shots will hurt [her]." (*Id.* ¶ 10.) Vitti does not allege whether she sought a medical or religious exemption from Hunterdon.

According to Plaintiffs, they were "slated to be fired from their jobs on April 24, 2022 because Governor Phil Murphy ha[d] ordered their employers to discipline them if they refuse to be injected again." (TRO Appl. 1.) Hagen allegedly "resigned on Friday to avoid the termination on her record, but wishes to return to work immediately if Executive Order 283 is enjoined." (*Id.*

1 n.1.)  Rumfield avers that she is "being suspended/terminated 4/12/22" for her refusal to get the

booster.  (Rumfield Decl. ¶ 11.)  Sczesny avers that she "was informed that [she had] until April

11, 2022 to get the booster, as per the state mandate set in place by Governor Murphy."  (Sczesny

Decl. ¶ 9.)

On April 21, 2022, Plaintiffs filed a Verified Complaint and Application in this Court

seeking a preliminary injunction from enforcement of the Executive Orders.  In addition to their

declarations, Plaintiffs submit exhibits.  (ECF Nos. 1, 2-1.)  The exhibits include dictionary

definitions of "vaccine," articles relating to Plaintiffs' arguments, and the Executive Orders.  (*See*

Wefer Decl., ECF No. 2-1.)  On May 9, 2022, Defendants filed an Opposition that also included

exhibits.  (ECF No. 10.)[4]  The exhibits include articles and data regarding the spread of COVID-

19 and vaccine effectiveness, the Executive Orders, and information on Hunterdon.  (Vannella

Decl., ECF No. 10-1.)  On May 13, 2022, Plaintiffs filed a Reply.  (ECF No. 13.)  The Application

is currently before the Court.

## II.   **PARTIES' ARGUMENTS**

### A.   **Plaintiffs' Application and Reply**

Plaintiffs primarily argue that the Executive Orders are unconstitutional under the

substantive due process clause of the Fourteenth Amendment because they interfere with the

fundamental rights of privacy and "declin[ing] unwanted medical procedures."  (TRO Appl. 11–

12.)  In support of their claims, Plaintiffs cite to *Washington v. Glucksberg*, 521 U.S. 702, 720

(1997) (acknowledging the fundamental right to "bodily integrity"); *Cruzan by Cruzan v. Dir.,*

*Missouri Dep't of Health*, 497 U.S. 261, 277 (1990) (noting that "the common-law doctrine of

informed consent is viewed as generally encompassing the right of a competent individual to refuse

---

[4] Defendants filed their Opposition late with consent of Plaintiffs and leave of the Court.  (*See* ECF
No. 9.)

medical treatment"); and *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 527

(3d Cir. 2018) (discussing the "individual interest in avoiding disclosure of personal matters and

the interest in independence in making certain kinds of important decisions") (internal quotation

marks and citations omitted).  (TRO Appl. 11–12.)

Plaintiffs assert that these cases establish that there is a fundamental right to refuse the

COVID-19 vaccines and booster and that the Supreme Court case, *Jacobson v. Massachusetts*, 197

U.S. 11 (1905), which upheld a vaccine requirement for smallpox, does not apply here.  (*Id.* 11–

13.)  Plaintiffs' principal argument distinguishing *Jacobson* is that the COVID-19 "vaccines" are

not truly "vaccines" as was the smallpox vaccine in *Jacobson*.  (TRO Appl. 14–21.)[5]  Plaintiffs

also argue that the factual differences between EO 283 and the regulation at issue in *Jacobson* are

so great that *Jacobson* does not apply.  Specifically, Plaintiffs argue that COVID-19 is not as

deadly as smallpox; that the COVID-19 vaccines have existed for less than two years unlike the

smallpox vaccine that was a century old; that Jacobson was issued a modest fine as punishment

for refusing the vaccine whereas, here, Plaintiffs would become unemployable; and that EO 283

is an executive action with no explicit authorization as opposed to the legislative action in

*Jacobson*.  (TRO Appl. 12–13; Reply 6–12, ECF No. 13.)

Accordingly, Plaintiffs argue that the Court should apply strict scrutiny when reviewing

the Executive Orders because *Jacobson* does not apply, and the Executive Orders involve the

fundamental right of bodily integrity.  (*See* TRO Appl. 11–12.)  Plaintiffs assert several reasons

why the Executive Orders are not "narrowly tailored to achieve the [State's] asserted interest" of

combatting the spread of COVID-19, (*id.* 22): (1) the advisory panels of the CDC and FDA

---

[5] For clarity and consistency, the Court refers to the COVID-19 "vaccines" as "vaccines"
throughout this Opinion.  The Court still addresses Plaintiffs' argument that they are not actually
"vaccines" in full. *See infra* IV.B.1.

recommended against third shots, (*id.* 24); (2) the vaccines carry serious health risks, (*id.* at 26); (3) the vaccines are of "questionable efficacy," (*id.* 29); (4) the vaccines are "investigatory and experimental," (*id.* 30); (5) most people "experience symptoms of illness after the injections," (*id.* 31); (6) the corporations manufacturing the injections have "extensive track records of criminality, fraud, and product safety issues," (*id.* 32); (7) the "FDA is not working properly to protect the public from dangerous pharmaceuticals," (*id.* 34); (8) the Executive Orders put "Plaintiffs on a 'vaccine' schedule mandated by a single federal government bureaucrat," the director of the CDC, (*id.* 35–36); (9) the Executive Orders fail to account for natural immunity, (*id.* 37); (10) there are several "FDA authorized treatments available" for COVID-19, (*id.* 38); and (11) COVID-19 has a "low infection fatality rate even without treatment," (*id.*). Alternatively, Plaintiffs argue that EO 283 also fails under rational basis review because the "government's asserted interest, combatting the spread of [COVID-19], is not rationally related to EO 283 since the pharmaceuticals do not prevent the spread of [COVID-19]." (*See* Reply 2, 12–14.)

Plaintiffs also argue that the Executive Orders violate their rights under the equal protection clause because they treat Plaintiffs differently based on their exercise of their fundamental right to decline the vaccines. (TRO Appl. 2.) Moreover, Plaintiffs argue that the Executive Orders deprive them of the ability to use their licenses without due process of law. (*Id.*)

With respect to Plaintiffs' request for immediate injunctive relief, Plaintiffs argue that the factors—irreparable harm to the moving party, harm to the non-moving party, and the public interest—favor granting the preliminary injunction because "government coercion" is "irreparable harm *per se*" and the government has no interest in enforcing an unconstitutional policy. (*Id.* 39–40.) Plaintiffs further assert that a preliminary injunction is necessary to "preserve the status quo" while the federal courts litigate the constitutionality of the Executive Orders. (*Id.* 39.)

### B.   Defendants' Opposition

Defendants first note that the Eleventh Amendment bars this lawsuit against the State of New Jersey and thus, the lawsuit may move forward only against Governor Murphy in his individual capacity and only with respect to prospective injunctive relief. (Opp'n 10 n.6, ECF No. 10.) Defendants also argue that a preliminary injunction is inappropriate because Plaintiffs' lawsuit will ultimately not prevail on the merits and the remaining equitable factors for preliminary injunction do not favor granting an injunction. (*Id.* 10–11, 19–22.)

As to the merits, Defendants assert that *Jacobson* applies to the Executive Orders. (*Id.* 11 (citing *Messina v. Coll. of New Jersey*, 2021 WL 4786114, at *6 (D.N.J. Oct. 14, 2021)).) Defendants argue that, because *Jacobson* controls, the Court should review the Executive Orders under rational basis review, which they "easily" pass. (*Id.* 12–14 (collecting cases and quoting *Smith v. Biden*, 2021 WL 5195688, at *7 (D.N.J. Nov. 8, 2021)).) Defendants also argue that Plaintiffs failed to show irreparable harm, (*id.* 19–20), and that public interest favors allowing the State to enforce its policies, (*id.* 21–22).

## III.   **LEGAL STANDARD**

Injunctive relief is an "extraordinary remedy," which courts should grant "only in limited circumstances." *Westchester Fire Ins. Co. v. Glob. Real Constr., LLC*, 2009 U.S. Dist. LEXIS 3481, at *3 (D.N.J. Jan. 16, 2009) (citing *Kos Pharms Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)). The decision to grant preliminary injunctive relief is within the sound discretion of the district court. *See id.*; *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended*, (June 26, 2017).

To obtain a preliminary injunction, a party must show (1) a likelihood of success on the merits, (2) that it will suffer irreparable harm if the injunction is denied, (3) that granting preliminary relief will not result in even greater harm to the nonmoving party, and (4) the public

interest favors such relief. *See Reilly*, 858 F.3d at 177, 179; *Perez v. Pena*, 2020 U.S. Dist. LEXIS

126415, at \*5 (D.N.J. July 17, 2020).   First, the moving party must meet the first two "most

critical" factors: "that it can win on the merits (which requires a showing significantly better than

negligible but not necessarily more likely than not) and that it is more likely than not to suffer

irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179 (internal citations

omitted).   Second, if the moving party meets "these gateway factors," the court "then considers

the remaining two factors and determines in its sound discretion if all four factors, taken together,

balance in favor of granting the requested preliminary relief." *Id.*

Courts in this district have interpreted an application for a temporary restraining order

("TRO") under the same framework as an application for the issuance of a preliminary injunction.

*Perez*, U.S. Dist. LEXIS 126415, at \*5; *see also NutraSweet Co. v. Vit-Mar Enters., Inc.*, 112 F.3d

689, 693 (3d Cir. 1997) (noting that the "Supreme Court [has] held that [a] [TRO] should be treated

as a preliminary injunction").

## IV.   **DISCUSSION**

### A.   **Sovereign Immunity**

As a threshold matter, Defendants raise the issue of sovereign immunity as a bar to suit

against the State.   (Opp'n 10 n.6.)   Plaintiffs do not contest this argument.

Plaintiffs bring the Verified Complaint against the "State of New Jersey, Governor Philip

Murphy (in his official and personal capacity)."   The Eleventh Amendment bars suits against

states.   U.S. CONST. amend. XI; *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100

(1984); *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 697 (3d Cir. 1996).   However, a plaintiff

may sue a state official for prospective injunctive relief.   *Ex parte Young*, 209 U.S. 123, 159–60

(1908); *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254–55 (2011); *Blanciak*, 77

F.3d at 697–98.  Accordingly, the Court does not consider Plaintiffs' claims against the State as sovereign immunity would bar these claims and assesses only Plaintiffs' request for an injunction preventing Governor Murphy from enforcing the Executive Orders.

### B.      Likelihood of Success on the Merits

The Court turns to Plaintiffs' arguments in favor of a preliminary injunction.  Plaintiffs assert a number of counts in the Verified Complaint, (Verified Compl. ¶¶ 68–97), but raise only due process, equal protection, and doctrine of unconstitutional conditions claims in the Application, (*id.* ¶¶ 68–78; TRO Appl. 2).  The Court assesses the likelihood of success on the merits of these claims.

### 1.      *Substantive Due Process – Fundamental Rights*

Given the United States Supreme Court precedent and persuasive authority from other Circuit and district courts, Plaintiffs fail to demonstrate likelihood of success on the merits of their claim that the Executive Orders violate their liberty rights under the due process clause of the Fourteenth Amendment.  Plaintiffs argue that the Executive Orders encroach on their fundamental right to "decline unwanted medical procedures" and thus strict scrutiny review applies to the Executive Orders.  (TRO Appl. 11–12.)  To make this argument, Plaintiffs assert that *Jacobson* does not apply to the Executive Orders.  (*Id.* 12–13.)  For the following reasons, the Court finds that *Jacobson* and rational basis review apply to the Executive Orders, and the Executive Orders are constitutional under rational basis review.

### a.      Applicability of *Jacobson*

In *Jacobson v. Massachusetts*, the United States Supreme Court upheld the constitutionality of a state law requiring members of the community to get smallpox vaccines when the "board of health" of the community recommended vaccination.  197 U.S. at 12, 39.  Pursuant

to the state law, the city of Cambridge adopted regulations requiring the "vaccination or revaccination of all inhabitants of Cambridge." *Id.* at 12. Jacobson, a resident of Cambridge, refused the vaccine and the state criminally charged him. *Id.* at 13. After a jury found him guilty under the statute and the court ordered him to pay $5 pursuant to the statute, Jacobson appealed to the Massachusetts Supreme Court and ultimately the United States Supreme Court. *Id.* at 14, 22. He argued that the state statute requiring the smallpox vaccination violated his Fourteenth Amendment rights to "life, liberty, or property," and "equal protection under the laws." *Id.* at 14.

The Supreme Court rejected Jacobson's argument and upheld the vaccine requirement. The Court emphasized that the "liberty secured by the Constitution of the United States . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id.* at 26. Rather, the Court recognized that "[t]here are manifold restraints to which every person is necessarily subject for the common good," *id.*, including the "safety of the general public," *id.* at 29, and a community's "right to protect itself against an epidemic of a disease which threatens the safety of its members," *id.* at 27.

Applying these principles to the Massachusetts law, the Supreme Court used a deferential standard to review state legislative action that aimed to "protect the public health, public morals, or the public safety" during the smallpox epidemic. *Id.* at 30–32. In doing so, the Court stated that it would strike down such a regulation only if it had no "real or substantial relation to those objects" or if it amounted to "a plain, palpable invasion of rights secured by fundamental law." *Id.* at 31. Courts interpret the review applied in *Jacobson* as "rational basis review." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J. concurring) (noting that the *Jacobson* court "essentially applied rational basis review" to the Massachusetts state law); *Smith*,

2021 WL 5195688, at *6–7 (interpreting *Jacobson* to apply "rational basis" review to the smallpox vaccine mandate).

Plaintiffs argue that the Executive Orders are distinguishable from the Massachusetts law and thus *Jacobson* does not control this case.  (TRO Appl. 12–13.)  Plaintiffs assert:  (1) the COVID-19 "vaccine" plus booster is not a vaccine; (2) the "consequence[]" for refusing the vaccine in *Jacobson* was a "modest fine" while the Executive Orders make Plaintiffs "unemployable in their field of work;" (3) COVID-19 is not "as deadly as smallpox;" (4) the COVID-19 "vaccines" "have existed for less than 2 years and are still in trials," and (5) the legislature in *Jacobson* "explicitly authorized" the local regulation while here the Executive Orders are "executive action with no explicit authorization." (*Id.* 13–14.)

First, Plaintiffs argue that the COVID-19 "vaccine" plus booster are not true vaccines because the mRNA and DNA COVID-19 "vaccines" contain "synthetic gene material" and not "pieces of microorganisms." (*See* Wefer Decl. Ex. Nos. 4–13, ECF No. 2-1 (attaching dictionary definitions of "vaccine" indicating that prior definitions of "vaccine" include "pieces of microorganisms" in the definition); TRO Appl. 14–21.)  Plaintiffs also enclose a Centers for Disease Control and Prevention ("CDC") "glossary," dated October 29, 2021, defining the term "vaccine" as "a suspension of live (usually attenuated) or inactivated microorganisms (e.g., bacteria or viruses) or fractions thereof administered to induce immunity and prevent infectious disease and their sequelae." (*See* Centers for Disease Control and Prevention, Glossary, Wefer Decl. Ex. 14, ECF No. 2-1.)

Defendants submit the position of the CDC indicating that the Pfizer-BioNTech, Moderna, and Janssen "vaccines" are "approved or authorized vaccines" to prevent COVID-19.  (Centers for Disease Control and Prevention, "Stay Up to Date with Your COVID-19 Vaccines," Vannella

Decl. Ex. 6, ECF No. 10-2.)  In defining "up to date with [] COVID-19 vaccines," the CDC includes "all doses in the primary series and one booster when eligible." (*Id.*)

Following its review of the parties' submissions, the Court finds that the CDC opines that the primary dose and booster, when eligible, are "vaccines." (*See id.*; *see also* Centers for Disease Control and Prevention, "What You Need to Know About Variants," Vannella Decl. Ex. 5, ECF No. 10-2 (noting that "[p]eople who are up to date on vaccines, including booster doses when eligible[,] are likely to have stronger protection against COVID-19 variants"). The Court defers to "the expertise of the CDC and its guidance with respect to COVID-19," including its definition of "vaccine." *Messina*, 2021 WL 4786114, at *8 (deferring to the CDC for the definition of "vaccine"); *see also Jacobson*, 197 U.S. at 28 (noting that the Court cannot "usurp the functions" of the board of health's determination that the vaccine was necessary "in order to protect the public health and secure the public safety"). Thus, the Court rejects Plaintiffs' argument that the COVID-19 "vaccines," including the first booster when eligible, are not vaccines. *See Smith*, 2021 WL 5195688, at *6; *Messina*, 2021 WL 4786114, at *8.

Second, Plaintiffs argue that the law in *Jacobson* is distinguishable from the Executive Orders because it imposed only a "modest fine" for refusing vaccination, while Plaintiffs face the decision between termination from their jobs and receiving an unwanted booster dose. (*See* TRO Appl. 13.) The Court first notes that the punishment for refusing to get the smallpox vaccine in *Jacobson* was more than a "modest fine," but rather, a fine and criminal prosecution. *See* 197 U.S. at 25–26. Further, the Executive Orders require covered settings to provide workers "exemption[s]" from vaccination to the extent required by state or federal law, due to disabilities, medical conditions, or sincerely held religious beliefs, practices, or observances. EO 283 ¶ 10. By requiring exemptions, the Executive Orders do not go as far as the regulation at issue in

*Jacobson*, which "lacked exceptions for adults," and thus imposed only the possibility of prosecution for noncompliance. *See Klaassen v. Trustees of Indiana Univ.*, 7 F.4th 592, 593 (2021) (upholding a state university policy requiring vaccination but allowing exemptions).

Third, regarding Plaintiffs' arguments that COVID-19 is not as "deadly as smallpox" and that the vaccines are not effective, it is not this Court's function to assess the deadliness of COVID-19 or "determine the most effective method to protect the public against COVID-19." *Messina*, 2021 WL 4786114, at *8; *see also Jacobson*, 197 U.S. at 30 ("It is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease.") However, the Court will note that COVID-19 has had a widespread and deadly impact. Pursuant to Defendants' submission, in the United States approximately 995,000 people have died from COVID-19, (Centers for Disease Control and Prevention, COVID Data Tracker, Vannella Decl. Ex. 1, ECF No. 10-2), and in New Jersey, approximately 30,500 people have died from COVID-19, (State of New Jersey, Department of Health, COVID-19 Dashboard, Vannella Decl. Ex. 2, ECF No. 10-2). The Court rejects Plaintiffs' attempt to distinguish *Jacobson* on the grounds that COVID-19 is less deadly than smallpox and the COVID-19 vaccines are not as effective as the smallpox vaccine.

Finally, Plaintiffs argue that, unlike in *Jacobson*, where the city of Cambridge had "explicit authorization" from the state to institute a vaccine mandate, here, Governor Murphy did not have explicit authorization to issue the Executive Orders. (TRO Appl. 13.) This argument is unfounded. The Executive Orders cite New Jersey's Emergency Health Powers Act, N.J.S.A. 26:13-1 *et seq.*, and Civilian Defense and Disaster Control Act, N.J.S.A. App. A:9-33 *et seq.*, as authoritative bases. New Jersey courts have upheld this exercise of authority. *See New Jersey State Policemen's Benevolent Ass'n v. Murphy*, 271 A.3d 333, 339–40 (App. Div. 2022) (finding that "[i]t is beyond

rational dispute that the Governor possessed the authority to issue Executive Order 283 under the Civilian Defense and Disaster Control Act" and also noting that, "[a]lthough unnecessary to our determination, we find the Governor was also empowered by the Emergency Health Powers Act").

Further, executive orders issued within a governor's expressly granted authority in the Civilian Defense and Disaster Control Act carry the force of law. *See* N.J.S.A. App. A:9-45 (granting the governor authority to issue executive orders and stating that "[a]ll such orders, rules and regulations having to do with the conduct of persons which shall be adopted by the Governor and promulgated as provided herein shall be binding upon each and every person within this State"). Here, Governor Murphy acted within the express delegation of authority by the New Jersey Legislature. Therefore, the Executive Orders carry the force of law. Accordingly, Plaintiffs have not demonstrated that the Executive Orders are distinct from the regulations at issue in *Jacobson*.

The Court joins numerous other courts, both in this district and across the country, to conclude that *Jacobson* established that there is no fundamental right to refuse vaccination in the context of COVID-19 and thus rational basis review applies to vaccine requirements. *Messina*, 2021 WL 4786114, at *9 (citing *Jacobson* and noting, "[a]lthough Plaintiffs have a right to refuse unwanted medical treatment, that right is not absolute"); *Smith*, 2021 WL 5195688, at *6 (noting that "every court that has considered the constitutionality of a COVID-19 vaccine mandate by an employer or university has deemed *Jacobson* controlling, rejected claims of a fundamental right to refuse a vaccine, and applied a rational basis standard of review"); *Klaassen*, 7 F.4th at 593 ("Given *Jacobson v. Massachusetts,* which holds that a state may require all members of the public to be vaccinated against smallpox, there can't be a constitutional problem with vaccination against SARS-CoV-2") (internal citation omitted); *Norris v. Stanley*, 2021 WL 4738827, at *2 (W.D.

17

Mich. Oct. 8, 2021), *appeal dismissed*, 2021 WL 6803021 (6th Cir. Nov. 24, 2021) (noting that "[o]ver the last year and a half, courts have looked to *Jacobson* to infer that a rational basis applies to generally applicable vaccine mandates"); *Williams v. Brown*, 2021 WL 4894264, at *3, 8 (D. Or. Oct. 19, 2021) (applying *Jacobson* and rational basis review to state health department rules requiring "healthcare providers and healthcare staff who work in a healthcare setting" to be fully vaccinated); *Johnson v. Brown*, 2021 WL 4846060, at *13 (D. Or. Oct. 18, 2021) ("As *Jacobson* reveals, the right to refuse vaccination is not deeply rooted in this nation's history."); *Mass. Corr. Officers Fed. Union v. Baker*, 2021 WL 4822154, at *6 (D. Mass. Oct. 15, 2021) ("Since *Jacobson*, courts have rejected the idea of a fundamental right to refuse vaccination.").

Thus, the Court analyzes the Executive Orders under rational basis review.[6]

### b.    Rational Basis Review

"Under rational basis review, the action of the government 'need only be rationally related to a legitimate government interest.'" *Smith*, 2021 WL 5195688, at *7 (quoting *Wilce v. Dir., Off. of Workers' Comp. Programs*, 144 F. App'x 223, 226 (3d Cir. 2005) (citing *Heller v. Doe*, 509 U.S. 312, 319–320 (1993))). "Governmental action is rationally related to a legitimate goal unless the action is clearly arbitrary and unreasonable, having no substantial relation to public health, safety, morals, or general welfare." *Williams*, 2021 WL 4894264, at *8 (quoting *Sylvia Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189, 1193 (9th Cir. 2013)) (internal quotation marks omitted).

The State's interests are stemming the spread of COVID-19, ensuring "the health and safety of [its] most vulnerable residents," and "maintaining a safe environment for its workforce and the effective and continued operation of essential health care services." (Opp'n 1, 14.) The

---

[6] The Court need not address Plaintiffs' strict scrutiny arguments (TRO Appl. 22–39) because it has determined that *Jacobson* and rational basis review apply to its review of the Executive Orders.

State also asserts that it has an interest in reducing the "risks of serious illness," reducing the "transmission of the virus to others," and "decreas[ing] the risk of hospitalization." (*Id.* 1.)

Here, "there can be no serious question that the government has a legitimate interest in preventing the spread of COVID-19," *Smith*, 2021 WL 5195688, at *7, and "protecting the health of its citizens," *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1614 (2020) (Kavanaugh, J., Gorsuch, J., and Thomas, J., dissenting). The Supreme Court has characterized this interest as "compelling." *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67 ("Stemming the spread of COVID–19 is unquestionably a compelling interest . . ."); *S. Bay United Pentecostal Church*, 140 S. Ct. at 1614 (Kavanaugh, J., Gorsuch, J., and Thomas, J., dissenting). And, for the purpose of their Application, Plaintiffs assume that the State has a compelling interest. (TRO Appl. 22.) Additionally, courts have found that a state's interests in "slowing the spread of COVID-19, protecting [the state's] citizens, . . . and preserving healthcare resources and protecting patients" are legitimate interests. *See Williams*, 2021 WL 4894264, at *9; *see also, e.g.*, *Johnson*, 2021 WL 4846060, at *14.

The remaining question is whether the Executive Orders are rationally related to the State's interests in stemming the spread of COVID-19, reducing the risk of serious illness or hospitalization, protecting its most vulnerable residents, and maintaining a safe environment for the continued operation of healthcare services. (*See* Opp'n 1, 14); *Smith*, 2021 WL 5195688, at *7. The Court finds such a rational relationship exists. First, numerous other courts have "easily conclude[d] that such a rational relationship exists—vaccines are a safe and effective way to prevent the spread of COVID-19." *Id.* In the context of COVID-19 vaccines as a requirement of employment, "[c]ourts have repeatedly refused to enjoin an employer's COVID-19 vaccine mandate, provided they contain legally required exemptions, finding that they pass muster under

the rational basis test." *Id.*; *see also, e.g., Maniscalco v. New York City Dep't of Educ.*, 563 F. Supp. 3d 33, 39–40 (E.D.N.Y. 2021), *aff'd*, 2021 WL 4814767 (2d Cir. Oct. 15, 2021), *cert. denied*, 142 S. Ct. 1668 (2022); *Norris*, 2021 WL 4738827, at *3; *Johnson*, 2021 WL 4846060, at *16; *Mass. Corr. Officers Fed. Union*, 2021 WL 4822154, at *7; *Harsman v. Cincinnati Children's Hosp. Med. Ctr.*, 2021 WL 4504245, at *3–4 (S.D. Ohio Sept. 30, 2021). Courts have also upheld such policies as a requirement for university attendance. *E.g., Messina*, 2021 WL 4786114, at *9; *Klaassen*, 7 F.4th at 593; *Harris v. Univ. of Mass., Lowell*, 557 F. Supp. 3d 304, 313–14 (D. Mass. 2021).

Second, in the context of an executive agency requiring vaccines for healthcare workers, the Supreme Court has endorsed similar mandates. *See Biden v. Missouri*, 142 S. Ct. 647, 653–55 (2022) (staying injunctions of CMS Rule requiring "covered staff" at Medicare- and Medicaid-participating healthcare centers to get vaccinated). In staying lower courts' injunctions of the CMS Rule, the Supreme Court noted that, "ensuring that providers take steps to avoid transmitting a dangerous virus to their patients is consistent with the fundamental principle of the medical profession: first, do no harm." *Id.* at 652; *see also id.* at 653 (acknowledging that "healthcare workers and public-health organizations overwhelmingly support the [CMS Rule]," which "suggests that a vaccination requirement under these circumstances is a straightforward and predictable example of the 'health and safety' regulations that Congress has authorized the Secretary to impose"); *see also State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1288, 1291–92 (11th Cir. 2021) (denying injunction of the CMS Rule and noting the agency's

20

finding that "it is the very opposite of efficient and effective administration for a facility that is supposed to make people well to make them sick with COVID-19").[7]

Third, courts have denied preliminary injunctions of similar state executive orders requiring covered settings to institute policies requiring healthcare workers to get vaccinated. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 293–94 (2d Cir.), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021) (finding that plaintiffs were unlikely to succeed on the merits of the claim that the state's "emergency rule" directing hospitals and other identified healthcare entities to "continuously require" employees to be fully vaccinated was unconstitutional under the due process clause); *Does 1-6 v. Mills*, 2021 WL 4783626, at *1, *12 (D. Me. Oct. 13, 2021), *aff'd*, 16 F.4th 20 (1st Cir. 2021), *cert. denied sub nom. Does 1-3 v. Mills*, 142 S. Ct. 1112 (2022) (denying preliminary injunction of Maine rule requiring employees of designated health centers to be vaccinated against COVID-19); *Andre-Rodney v. Hochul*, 2021 WL 5050067, at *6–7 (N.D.N.Y.

---

[7] While in *Biden v. Missouri* and *State of Florida v. Department of Health and Human Services*, the Supreme Court and Eleventh Circuit reviewed the CMS Rule in the context of whether it fell within the agency's rulemaking authority and whether it survived the "arbitrary and capricious" standard of review of an agency's rule under the Administrative Procedure Act, courts have drawn parallels between "rational basis" and "arbitrary and capricious" standards of review. *See Sierra Club v. United States Env't Prot. Agency*, 972 F.3d 290, 298 (3d Cir. 2020) (articulating that an agency's regulation is "arbitrary and capricious" when the agency "offer[s] only a 'conclusory statement' which 'fail[s] to articulate a rational basis for its conclusion'") (quoting *W.R. Grace & Co. v. U.S. E.P.A.*, 261 F.3d 330, 342 (3d Cir. 2001)); *Chemung Cnty. v. Dole*, 781 F.2d 963, 971 (2d Cir. 1986) (on review of agency decision, noting that "[t]he standard of review—rational basis or arbitrary and capricious—is determined by statute"); *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 290 (1974) (on review of Interstate Commerce Commission decision, noting that "the 'arbitrary and capricious' test does not require more" than the agency having a "rational basis" for its decision). Thus, while this Court reviews the Executive Orders under a different standard of review (constitutional rational basis) from the Supreme Court's and Eleventh Circuit's review of the CMS Rule (within the agency's statutory authority, and arbitrary and capricious), the Court still finds the decisions in *Biden v. Missouri* and *State of Florida v. Department of Health and Human Services* helpful in determining whether to uphold an executive order requiring healthcare workers at covered settings to be up to date with vaccinations.

Nov. 1, 2021) (denying preliminary injunction of state order requiring "covered entities," including hospitals, to "continuously require personnel to be fully vaccinated against COVID-19").

In *Williams*, the court stated that it "ha[d] no trouble concluding that the vaccine mandates [were] rationally related to a legitimate state interest" when the executive orders set forth the history of COVID-19 in Oregon, noted the efficacy of the vaccines, and concluded that the vaccine mandate was necessary to control the spread of COVID-19. 2021 WL 4894264, at *9; *see also Andre-Rodney*, 2021 WL 5050067, at *7 (finding that "[s]temming the spread of COVID-19 is unquestionably a compelling [state] interest . . . and requiring those who work in healthcare settings to be vaccinated is rationally related to the furtherance of that interest") (internal citations omitted); *Johnson*, 2021 WL 4846060, at *16 ("The decision to require vaccination among state executive agency employees, and critical populations such as healthcare workers and providers and education workers and volunteers, is a rational way to further the State's interest in protecting health and safety during the COVID-19 pandemic."); *Does 1-6*, 2021 WL 4783626, at *12 (finding that "[t]he State defendants have provided ample support demonstrating a rational basis for their adoption of the COVID-19 vaccine as a requirement that furthers the government's interest in protecting public health, healthcare workers, vulnerable patients, and Maine's healthcare system from the spread of COVID-19").

In this case, the Executive Orders outline the CDC's findings that the COVID-19 booster prevents further spread, that the Omicron variant has "increased transmissibility," and that "expedient and additional public health action is necessary" to prevent further spread and to prevent severe impacts on the health of individuals and the health care system due to the rapid transmissibility of the Omicron variant. EO 283 at 4 (noting that "according to the CDC, studies show after getting the primary series of a COVID-19 vaccine, protection against the virus and the

22

ability to prevent infection may decrease over time, in particular due to changes in variants;" and that "the CDC has reported that vaccinated people who receive a COVID-19 booster are likely to have a stronger protection against contracting and transmitting COVID-19, particularly the Omicron variant, and stronger protection against serious illness, including hospitalization and death").

The Executive Orders also cite data regarding the vaccination status of the general population and of healthcare workers, note that there are lower rates of people who have received the booster, and acknowledge that there is "waning immunity" against the virus for those without the booster. *Id.* at 4–5 (noting that "only 48 percent of eligible individuals statewide have received their booster shot" and "waning immunity among health care workers increases their susceptibility to the virus and can place further strain on the State's health care workforce, threatening the State's ability to provide critical care to individuals").

Plaintiffs argue that the Executive Orders are not rationally related to the State's interest because the Executive Orders were "predicated on the fact that it was believed that the shots [vaccines] would prevent infection and transmission, but that fact is now known to be incorrect." (Reply 12.) Plaintiffs rely on *Schumacher v. Nix*, 965 F.2d 1262 (3d Cir. 1992) to support the proposition that, "under rational basis review, the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." (*Id.* (quoting *Shumacher*, 965 F.2d at 1271) (internal quotation marks omitted).)

In *Schumacher*, the plaintiffs challenged Pennsylvania's Bar Admission Rule, which prohibited graduates of unaccredited law schools to sit for the Pennsylvania bar examination unless they were in good standing of the bar of a reciprocal state and had practiced law there for five

years. 965 F.2d at 1263–64. The Bar Admission Rule "intended to secure for Pennsylvania attorneys who decide to relocate, the advantage of favorable terms of admission to another state's bar by offering the same advantage to attorneys of such other state that will reciprocate." *Id.* at 1270 (internal quotation marks omitted).

The plaintiffs graduated from an unaccredited law school and had practiced for more than five years in California, which did not have reciprocity with Pennsylvania; thus, they could not sit for the Pennsylvania bar exam and were ineligible to practice in Pennsylvania. *Id.* at 1263–64. The plaintiffs argued that the rule did not pass muster under rational basis review because Pennsylvania's reciprocal states allowed only graduates of accredited schools to waive in without taking the bar examination. *Id.* at 1272. Thus, the plaintiffs argued that, as applied, the rule did not further Pennsylvania's interest in securing favorable terms of admission to reciprocal states for attorneys who likewise graduated from unaccredited law schools. *Id.* at 1265, 1271–72. The Third Circuit agreed that, in practice, the rule may not have furthered Pennsylvania's interest in ensuring reciprocity for Pennsylvania attorneys from unaccredited schools; however, the court determined that the plaintiffs framed Pennsylvania's interest too narrowly because Pennsylvania had a legitimate interest in securing mutual treatment for *all* of its attorneys, whether they were graduates of accredited or unaccredited law schools. *Id.* at 1272. The Third Circuit determined that, "even if the [Rule] [did] not promote Pennsylvania's reciprocity interest as to its attorneys who are graduates of unaccredited law schools, . . . the Rule would pass rational basis review if it furthered the state's reciprocity interest as to its attorneys who are graduates of accredited law schools." *Id.* Accordingly, the court held that it "[would] not second guess the manner in which Pennsylvania has chosen to implement [the] Rule [], where that Rule bears at least some reasonable

relation to Pennsylvania's interest in securing mutual treatment for its attorneys seeking admission to bars of other states." *Id.* at 1273.

Plaintiffs also argue that the Executive Orders are "irrational" because the State's interest "in stemming the spread of [COVID-19] is disconnected from EO 283's requirement that people keep taking doses of pharmaceuticals that do not prevent the spread of [COVID-19]." (Reply 13). Plaintiffs cite *Jimenez v. Weinberger*, 417 U.S. 628 (1974) for the proposition that a policy is irrational if it classifies people differently to achieve a government interest, but the classification does not advance the government interest. (Reply 13–14.) In *Jimenez*, the plaintiff challenged, on equal protection grounds, the constitutionality of a social security provision denying benefits to illegitimate children. 417 U.S. at 631–32. The asserted state interest was the "prevention of spurious claims." *Id.* at 636. The Court determined that, while preventing spurious claims was a legitimate state interest, the provision was unconstitutional because it created two subclasses of illegitimate children—those who were deemed entitled to receive benefits without any showing that they were in fact dependent upon their disabled parent and those who were conclusively denied benefits even though they were dependent upon their disabled parent. *Id.* at 635–36. The Court concluded that the "two subclasses of illegitimates stand on equal footing, and the potential for spurious claims is the same as to both; hence to conclusively deny one subclass benefits presumptively available to the other denies the former the equal protection of the laws[.]" *Id.* at 637.

The Court does not find Plaintiffs' arguments persuasive. Similar to *Schumacher*, Plaintiffs frame the State's interest too narrowly by claiming that the State's sole interest in issuing the Executive Orders was to prevent infection and transmission and that in practice the Executive Orders do not accomplish that goal. Plaintiffs cite to articles that highlight the debate around

recommending boosters for health care workers, specifically that some medical professionals and policymakers disagreed with this recommendation. (*See* Apoorva Mandavilli and Benjamin Mueller, *C.D.C. Chief Overrules Agency Panel and Recommends Pfizer-BioNTech Boosters for Workers at Risk*, THE NEW YORK TIMES (Sept. 24, 2021, updated Oct. 21, 2021), Wefer Decl. Ex. 16, ECF No. 2-1 (noting that the debate surrounding the CDC's determination to recommend the first booster to frontline workers was "close" because, while CDC director believed it would "best serve the nation's public health needs," other CDC advisers "disagreed that the doses were needed by so many healthy people"); *WATCH: FDA panel shows frustration in booster dose debate*, PBS NEWS HOUR (Sept. 17, 2021), Wefer Decl. Ex. 17 (discussing the debate of "the value of mass boosters"); Emily Anthes, *Booster protection wanes against asymptomatic Omicron infections, British data suggests*, THE NEW YORK TIMES (Dec. 23, 2021), Wefer Decl. Ex. 22 (noting that early data suggest that "booster protection against asymptomatic Covid caused by the Omicron variant wanes within 10 weeks" but that "experts believe the shots will continue to provide significant protection against hospitalization and death").

The Executive Orders, however, make clear that the State's interest is not only to prevent infection and transmission, but also to "protect[] against serious illness, including hospitalizations and death[,] and "increase the number of health care workers who are up to date with their COVID-19 vaccinations[.]" EO 283 at 4–5. The State submitted evidence indicating that the vaccines were "associated with high short-term protection against SARS-CoV-2 infection" but that "this protection waned considerably after 6 months," thereby warranting the need for boosters. (*See* V. Hall, *et al.*, "Protection against SARS-CoV-2 after Covid-19 Vaccination and Previous Infection," New Eng. J. Med. (Vol. 386, No. 13) (Mar. 31, 2022), Vannella Decl. Ex. 7, ECF No. 10-2 (noting that the "[s]trategic use of booster doses of vaccine to avert waning of protection . . . may reduce

infection and transmission in the ongoing response to Covid-19"); *see also* Jill M. Ferdinands, Ph.D., *et al.*, "Waning 2-Dose and 3-Dose Effectiveness of mRNA Vaccines Against COVID-19-Associated Emergency Department and Urgent Care Encounters and Hospitalizations Among Adults During Periods of Delta and Omicron Variant Predominance—VISION Network, 10 States, August 2021–January 2022," MMWR (Vol. 71, Feb. 18, 2022), Vannella Decl. Ex. 8, ECF No. 10-2 ("These findings underscore the importance of receiving a third dose of mRNA COVID-19 vaccine to prevent both COVID-19-associated [emergency department/urgent care] encounters and COVID-19 hospitalizations among adults.").

In *Jacobson*, Jacobson submitted evidence that some medical professionals believed that there was "little or no value to vaccination as a means of preventing the spread of smallpox," or "that vaccination cause[d] other diseases of the body." 197 U.S. at 30–31. There, the Supreme Court noted that it was the role of the legislature, and not the court, to weigh "opposing theories" when making its determination to mandate the vaccine. *Id.* at 31–32. Thus, in reviewing the submissions of the parties, the Court does not evaluate the efficacy or safety of the vaccine, or the best way to prevent the spread of COVID-19, but rather looks to see whether the State has asserted a rational basis for the Executive Orders. *See Messina*, 2021 WL 4786114, at *8–9. Based on the State's submissions, the State has set forth a strong likelihood that the Executive Orders have a "real or substantial relation" to the "legitimate interest" of stemming the spread of COVID-19 and protecting the public health. *See Jacobson*, 197 U.S. at 32; *Smith*, 2021 WL 5195688, at *7. While Plaintiffs' articles suggest that there may have been different viewpoints as to recommending boosters for health care workers, Plaintiffs do not demonstrate that the Executive Orders are "irrational."

In sum, "[t]he decision to require vaccination among state executive agency employees, and critical populations such as healthcare workers and providers and education workers and volunteers, is a rational way to further the State's interest in protecting health and safety during the COVID-19 pandemic." *See Johnson*, 2021 WL 4846060, at *16. Accordingly, the Court finds that the Executive Orders are rationally related to the State's asserted interests in "the health and safety of [its] most vulnerable residents," and "maintaining a safe environment for its workforce and the effective and continued operation of essential health care services." (*See* Opp'n 1, 14). Accordingly, Plaintiffs have not met their burden of likelihood of success on the merits of their substantive due process claim.

2.      *Procedural Due Process*

Plaintiffs also fail to show a likelihood of success on the merits for their procedural due process claim. They address this argument in a single sentence, stating that the Executive Orders have "deprived them of the ability to use their licenses without due process of law." (TRO Appl. 2.)

The Due Process Clause of the Fourteenth Amendment provides that a State may not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. "Procedural due process requires notice and an opportunity to be heard before a person is deprived of a protected interest, except for 'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *Speth v. Goode*, 2010 WL 4669714, at *4 (D.N.J. Nov. 9, 2010) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 n.7 (1972). "In analyzing a procedural due process claim, 'the first step is to determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment.'" *B.K. v. Grewal*, 2020 WL 5627231, at *7

(D.N.J. Sept. 21, 2020), *appeal dismissed sub nom. Doe v. Att'y Gen. of New Jersey*, 2020 WL
9259657 (3d Cir. Nov. 25, 2020) (quoting *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000)). "If
the asserted interest falls within the protections of the Due Process Clause, the second step is to
determine whether the plaintiff was afforded all of the process he was due." *Id.*

  Plaintiffs' procedural due process claim is unlikely to succeed for several reasons. First,
Plaintiffs do not cite authority to support their assertion that they have protected property or liberty
interests in their ability to use their licenses. *See B.P. by & through L.P. v. N. Allegheny Sch. Dist.*,
2022 WL 114075, at *5 (W.D. Pa. Jan. 12, 2022) (rejecting procedural due process claim when
plaintiffs cite no case showing that they had a protected property interest).[8] And, even if the Court
determines that Plaintiffs' licenses to practice are protected property interests, Plaintiffs have not
set forth evidence to demonstrate that they will in fact lose their licenses due to the Executive
Orders. *See Andre-Rodney*, 2021 WL 5050067, at *7 (rejecting procedural due process claim
when plaintiffs "cite[d] no authority for [the] proposition [that they possessed a property interest
in their jobs] and provide[d] no facts which might otherwise support a finding that they have a
protected property interest in their continued employment").

  Further, as noted above, Governor Murphy issued the Executive Orders pursuant to
delegated legislative authority and the Executive Orders carry the force of law. *See supra* IV.B.1.
Accordingly, the Executive Orders are more similar to "rules of general applicability," which do
not require notice and a hearing. *See Harris*, 557 F. Supp. 3d at 312 (rejecting procedural due
process argument because the vaccine policy at issue "is generally applicable to all students and
formulated prospectively toward the fall semester, i.e., a legislative rule rather than an

---

[8] And the Court has previously determined that Plaintiffs are unlikely to succeed on the merits that
they have liberty interests in refusing the vaccine. *See supra* IV.B.1.

adjudication"); *Williams*, 2021 WL 4894264, at *5–6 (rejecting plaintiffs' procedural due process claim and noting that a governor's executive orders and health department regulations requiring vaccines are more comparable to laws of general applicability or "legislative" acts). To the extent any process is required, the Executive Orders provide a process for an employee to request individual exemptions for medical or religious reasons through their employer. *See Williams*, 2021 WL 4894264 at *6 (rejecting plaintiffs' procedural due process challenge to vaccine mandate and noting that the ability to apply for exemptions to the vaccine mandates provides some process).

      3.   *Equal Protection*

Plaintiffs also fail to show a likelihood of success on the merits of their equal protection claim. Plaintiffs raise their equal protection challenge in a single paragraph in the Application. (TRO Appl. 2.) They argue that the Executive Orders violate "the equal protection clause of the Fourteenth Amendment because [they] treat[] Plaintiffs differently based on the exercise of their fundamental rights . . ." (*Id.*)

In evaluating equal protection claims, the "first step . . . is to determine the standard of review." *Smith*, 2021 WL 5195688, at *8 (citing *Donatelli v. Mitchell*, 2 F.3d 508, 513 (3d Cir. 1993). Plaintiffs' claims do not involve a suspect class or fundamental right, and thus, the same rational basis standard of review applies. *Id.*; *Williams*, 2021 WL 4894264, at *9 ("As with substantive due process, courts have routinely rejected the argument that vaccine mandates will trigger heightened scrutiny under the Equal Protection Clause and have instead applied rational basis review.") Accordingly, for the reasons set forth above, Plaintiffs are not likely to succeed on the merits of this claim. *See Does 1-6*, 2021 WL 4783626, at *16 (rejecting equal protection claim by employees related to employer's COVID-19 mandate under rational basis review).

### 4.     *Doctrine of Unconstitutional Conditions*

Finally, the Court addresses Plaintiffs' argument that the Executive Orders violate the doctrine of unconstitutional conditions.   (TRO Appl. 2.)   Plaintiffs assert that the booster requirement "violates the doctrine of unconstitutional conditions, which prohibits the government from conditioning a privilege on the surrender of a constitutional right." (*Id.* (citing *Frost v. R.R. Comm'n of State of California*, 271 U.S. 583 (1926)).)  However, Plaintiffs have not demonstrated a likelihood of success on their claims that the Executive Orders violate their constitutional rights, *see supra* IV.B.1.–3., and thus, the Court rejects their unconstitutional conditions argument. *See Smith*, 2021 WL 5195688, at *8 (rejecting unconstitutional conditions argument because there is no fundamental right to refuse the COVID-19 vaccine); *Norris*, 2021 WL 4738827, at *3 (same).

### C.     Irreparable Injury to Plaintiffs

Nor have Plaintiffs made a "clear showing of immediate irreparable injury." *See Perez*, 2020 U.S. Dist. LEXIS 126415, at *5.  Plaintiffs assert that the Executive Orders cause "irreparable harm" because they amount to "government coercion" and "require[] Plaintiffs to undergo an irreversible medical procedure that carries serious risk or lose their jobs." (TRO Appl. 39.)

On the Court's review of Plaintiffs' submissions, Plaintiffs fail to demonstrate immediate and irreparable injury.  First, Plaintiffs delayed bringing their claims.  Plaintiffs had notice of the April 11 deadline for the booster requirement as of the issuance of EO 290, which occurred on March 2, 2022.  EO 290 ¶¶ 1.b, 2.b. (requiring covered workers to provide "adequate proof that they received a booster dose by April 11, or within three weeks of becoming eligible for the booster").  They had even earlier notice of the booster requirement generally, despite the changes in schedules, as of the issuance of EO 283 on January 19, 2022, *see* EO 283 ¶¶ 1.b., 2.b., 8, and as of the initial denials of Hagen's and Rumfield's exemption requests in February 2022, (Hagen

Decl. ¶ 21; Rumfield Decl. ¶¶ 9–10). The fact that Plaintiffs waited to bring this challenge until April 21, 2022, weighs against the "immediacy" of the harm. *See Smart Vent Prods. v. Crawl Space Door Sys.*, 2016 U.S. Dist. LEXIS 108052, at *35 n.16 (D.N.J. Aug. 15, 2016) (noting that "any delay in seeking [] relief [] necessarily informs the irreparable harm inquiry"); *Nat'l Ass'n v. Murphy*, 2020 U.S. Dist. LEXIS 125567, at *3 (D.N.J. July 14, 2020) (denying temporary restraints when plaintiffs sought injunction of Governor Murphy's executive orders closing movie theatres due to COVID-19 because plaintiffs had opportunities to request a TRO after the initial executive order and subsequent modifications).

Second, Plaintiffs assert that they face immediate and irreparable injury because they would lose their jobs on or around the date range of April 11, 2022, through April 24, 2022.[9] However, the Executive Orders do not, on their own, require termination, but rather require covered settings to have "disciplinary process[es]" that "may include" termination. EO 283 ¶ 4. They also permit covered settings to impose "additional or stricter requirements." *Id.* ¶ 9. Plaintiffs do not assert specific facts that demonstrate that Hunterdon's disciplinary policies pursuant to the Executive Orders actually necessitate these terminations and/or suspension dates. Indeed, Plaintiffs have not provided a copy of Hunterdon's policy with their submissions.

Third, Plaintiffs have not asserted that the requested relief of enjoining Governor Murphy would redress their alleged injuries. Plaintiffs do not specify whether Hunterdon is subject to the CMS Rule. Defendants submit exhibits that suggest that Hunterdon is a Medicare- or Medicaid-

---

[9] The Court bases this date range on Plaintiffs' arguments in the Application, (*see* TRO Appl. 1, 1 n.1 (stating that Plaintiffs were "slated to be fired on April 24, 2022" and that Hagen "resigned on Friday to avoid the termination on her record")), and Plaintiffs' individual declarations (*see* Rumfield Decl. ¶ 11 (averring that she was "suspended/terminated 4/12/22"); Sczesny Decl. ¶ 9 (averring that she "was informed that [she had] until April 11, 2022 to get the booster, as per the NJ state mandate set in place by Governor Murphy")).

certified provider and thus, is subject to the CMS Rule.  (*See* Hunterdon Healthcare, "Insurance Information," Vannella Decl. Ex. 15, ECF No. 10-2 (listing "Medicare" as an insurance provider); Hunterdon Healthcare, "Clinical Quality," Vannella Decl. Ex. 16, ECF No. 10-2 (noting that Hunterdon leads hospitals for its quality medical care, as indicated by CMS measurements).)  If Hunterdon is subject to the CMS Rule, enjoining the enforcement of the Executive Orders may not alter whether Plaintiffs must be "up to date" with their vaccinations.  And, even if Hunterdon was not subject to the CMS Rule, Plaintiffs have not demonstrated that enjoining the State's enforcement of the Executive Orders would prevent Hunterdon from maintaining a policy requiring its employees to get boosters on its own.  Indeed, it was Hunterdon, and not the State, that reviewed and denied Plaintiffs' exemption applications.  (*See* Hagen Decl. ¶ 21; Rumfield Decl. ¶¶ 8–10; Sczesny Decl. ¶ 16.)

Finally, to the extent that Plaintiffs request the Court to enjoin Hunterdon, a non-party, from enforcing its policies pursuant to the Executive Orders, the Court declines this request.  (*See* Proposed Order 1–2.)  The Court will not issue a TRO or preliminary injunction to a non-party. *See* Fed. R. Civ. P. 65(d)(2)(A) (restricting courts' issuance of injunctions and restraining orders to "parties" and other individuals not applicable in this case).

The Court should grant injunctive relief only in "limited circumstances" where doing so would prevent immediate and irreparable injury.  *See Westchester Fire Ins. Co.*, 2009 U.S. Dist. LEXIS 3481, at *3.  This lack of redressability weighs against the Court granting Plaintiffs' requested relief for their alleged injuries.

In sum, the Court finds that Plaintiffs have not demonstrated immediate and irreparable injury that warrants a preliminary injunction.

###### D.      Remaining Preliminary Injunction Factors

Plaintiffs' failure to demonstrate likelihood of success on the merits and irreparable harm precludes injunctive relief because those are "gateway factors" of the Court's preliminary injunction inquiry.   *Reilly*, 858 F.3d at 179.   However, the Court notes that the remaining two factors—harm to the non-moving party and the public interest—also favor denying the Application.

"The third and fourth factors for the issuance of injunctive relief merge when the government is the opposing party." *Smith*, 2021 WL 5195688, at *9 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).   While Plaintiffs argue that "the Government does not have an interest in the enforcement of an unconstitutional law," (TRO Appl. 40 (quoting *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (internal quotation marks omitted), the Court has determined that Plaintiffs are not likely to succeed on the claim that the Executive Orders are unconstitutional under the due process and equal protection clauses, *see supra* IV.B.   Further, the State faces harm when an injunction prevents it from enforcing a "duly enacted statute." *Maryland v. King*, 567 U.S. 1301, 1303 (2012).   Here, where the Executive Orders carry the force of law, the State has an interest in their enforcement.

The public interest would also suffer if the Court granted Plaintiffs' requested relief.  *See Messina*, 2021 WL 4786114, at *10 ("Enjoining the Mandate would not serve the public interest in preventing the spread of COVID-19, a virus that has taken the lives of many New Jersey residents.").   Where the stated purpose of the Executive Orders is to keep healthcare workers "up to date with their COVID-19 vaccinations," in light of the "significant risk of spread and vulnerability of the populations served" in health care settings, the public interest is served in allowing the continued enforcement of the Executive Orders.  *See EO 283 at 5–6; see also Smith*,

34

2021 WL 5195688, at *9 (finding that, where executive order's goal was to maintain the health of the federal workforce, and prevent the spread of COVID-19, the public interest factor weighed against enjoining the executive order).

In sum, the Court finds that Plaintiffs have failed to demonstrate likelihood of success on the merits and irreparable injury, and the remaining preliminary injunction factors weigh against granting the Application.

## V.   **CONCLUSION**

Accordingly, for the foregoing reasons, Plaintiffs' Application for a Temporary Restraining Order and/or Preliminary Injunction (ECF No. 2) is **DENIED**.  An appropriate Order will follow.

Date: June 7, 2022

GEORGETTE CASTNER, U.S.D.J.